IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **Midwestern Well Service, Inc,** )<br>       )<br>     Plaintiff,   )<br>       )<br>  v.    )<br>       )<br>**Jerry R. Sorrels,** *individually and* )<br>*doing business as* Cheyenne Oil )<br>Properties,    )<br>       )<br>     Defendant.   ) | Case No.11-1315-RDR |

**MEMORANDUM AND ORDER**

This matter is presently before the court upon the motion for partial summary judgment of plaintiff and counter-defendant Midwestern Well Service, Inc. Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

I.

Midwestern brought this diversity action against Jerry Sorrels, individually and doing business as Cheyenne Oil Properties, to collect sums for work performed on oil and gas wells that Cheyenne operated in Sumner County, Kansas. In response, Cheyenne asserted a counterclaim against Midwestern alleging the work was defective and caused the complete loss of one of the oil and gas wells. Cheyenne contended that it was entitled to damages for (1) repairs to the well undertaken after the work of Midwestern; and (2) the cost to drill a new well.

In the instant motion, Midwestern contends that Cheyenne is not

entitled to damages for the cost to drill a new well to replace the one that it allegedly damaged. Midwestern disputes that Cheyenne is entitled to any relief, but in this motion, argues only that Cheyenne cannot recover in damages for the cost of drilling a new well.

II.

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The requirement of a genuine issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Essentially, the inquiry is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. This burden may be met by showing that there is a lack of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to show that there

2

is a genuine issue of material fact left for trial.  See Anderson, 477 U.S. at 256.  A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial.  Id.  Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment.  See id.  The court must consider the record in the light most favorable to the nonmoving party.  See Bee v. Greaves, 744 F.2d 1387, 1396 (10th Cir. 1984), cert. denied, 469 U.S. 1214 (1985).  The court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."  Celotex, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

### III.

Cheyenne contracted with Midwestern to perform work on the Wentworth # 1 and Coggins # 1 wells in Sumner County, Kansas.  Midwestern was hired to perform certain tasks (a squeeze job and an acid job) on Wentworth # 1 and to bring it back online for the production of oil and gas.  Midwestern worked on the Wentworth # 1 well from June 14, 2010 through July 14, 2012.  Midwestern billed Cheyenne $63,910.99 for the work performed and goods provided on Wentworth # 1.  Midwestern then went to work on the Coggins # 1 well.

Midwestern worked on Coggins # 1 from July 14, 2010 to July 29, 2010. Midwestern billed Cheyenne $16,700.42 for work on the Coggins # 1 well. Cheyenne has not paid Midwestern for any portion of the amounts billed for the work performed and the goods provided for the two wells.

Cheyenne alleges that the actions of Midwestern on July 6, 2010 caused damage to the Wentworth # 1 well. Cheyenne alleges that Midwestern caused damage to the casing. Cheyenne had work done on Wentworth # 1 in August and September 2010. Cheyenne was billed $36,615.41 for this work. Cheyenne now contends that Wentworth # 1 is a complete loss because of the casing holes and the only way to produce the oil reserves is from a new well.

The prior history of Wentworth # 1 shows that in July 2007 Cheyenne began working to re-complete and re-establish it. The well had previously been abandoned when it developed holes in the casing. After the work was completed, Cheyenne estimated the well could produce 2 to 3 barrels per day. The well was put on the pump to produce but it kept gas locking and the well was shut in. There was no production from Wentworth # 1 from the time the well was shut in after the July 2007 work until January 2009. Some work was done on the well in January 2009, but swabbing showed only slight oil. The well was worked on again in March 2009. The swabbing again indicated only a slight show of oil and the well was again shut in. Cheyenne

worked on the well again in November 2009. The only production records from Wentworth # 1 were from December 10 to December 26, 2009. The well produced 73.6 barrels of fluid. There is no indication that any of this fluid was sold.

On April 1, 2010, Cheyenne assigned a 100% working interest in Wentworth # 1 and other wells to Kelley Edgar Oil & Gas Operations, LLC. On May 1, 2012, Kelley Edgar Oil & Gas & Operations, LLC assigned its interest in the well-bore of Wentworth # 1 back to Cheyenne.

IV.

Since this is a diversity action, the substantive law of the forum state, including that forum state's choice of law rules, applies. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941). The measure of damages is substantive law, and thus Kansas law controls. See Henderson v. Nat'l Fid. Life Ins. Co., 257 F.2d 917, 919 (10th Cir. 1958).

For the purposes of determining damages, Wentworth # 1 is personal property. As such, the court begins with the general rules for damages in Kansas for personal property. The rules that have been applied by the Kansas courts appear to generally be the same no matter whether the claim is based in contract or tort.

The amount of damages recoverable is dependent upon whether the damages are permanent or temporary. This is a question of fact.

As the court states the general rules for damages, we must acknowledge that the determination of damages in any case requires a thorough examination of the facts and circumstances without any mechanical application of a single formula. As stated in <u>Kansas Power & Light Co. v. Thatcher</u>, 14 Kan.App.2d 613, 797 P.2d 162, 165 (1990):

> While the Kansas decisions give the courts a great deal of latitude in arriving at the proper measure of damages depending on the facts present, it appears that all of the carious approaches at computing damages have the same ultimate goal: to make the damaged party whole.

Damages are not allowed, however, which grant a windfall. <u>Service Iron Foundry, Inc. v. M.A. Bell Co.</u>, 2 Kan.App.2d 662, 588 P.2d 463, 476 (1978).

When repairs can restore the property to its previous condition, the measure of damages is the fair and reasonable cost of repairs not to exceed the value of the property before the damages. PIK Civil 4th 171.10; <u>Nolan v. Auto Transporters</u>, 226 Kan. 176, 597 P.2d 614, 621 (1979). When repairs fail to restore the property, the value of the property immediately before the damage less the value immediately after the repairs are made, plus the reasonable cost of the repairs may be applied. <u>Venable v. Import Volkswagen, Inc.</u>, 214 Kan. 43, 519 P.2d 667, 673 (1974). When the damage is permanent or irreparable, the measure of damages is the difference between the fair and reasonable market value of the property immediately before and immediately after the injury. PIK Civil 4th 171.11; <u>Ultimate

6

Chemical Co. v. Surface Transp. Intern., Inc., 232 Kan. 727, 658 P.2d 1008, 1011 (1983). If the destroyed property has no market value, then the measure of damages is its real , actual or intrinsic value. See Thatcher, 797 P.2d at 165. In determining this amount, the following factors are relevant: original value, cost of replacement, loss of use, condition, age and obsolescence. Id.; see also PIK Civil 4th 171.12.

The parties have cited to several Kansas cases on oil and gas damages. These cases, however, provide little guidance to the issues in this case. The court notes that the general rules on damages in Kansas have generally been applied in other states in similar oil and gas cases. See, e.g., Dresser Industries, Inc. v. Page Petroleum, Inc., 853 S.W.2d 505, 512 (Tex. 1993)(plaintiff entitled to recover cost of expenditures to save well and cost of new well when well could not be saved, but damages could not exceed fair market value of well prior to damage); Atex Pipe & Supply, Inc. v. Sesco Production Co., 736 S.W.2d 914, 917 (Tex.App. 1987)(damages to well caused by defective tubing was difference in reasonable market value of well before and immediately after tubing collapse if well cannot be reproduced or cost of reproduction exceeds cost of value of well; if well can be reproduced by drilling new one, proper measure of damages is cost of drilling and equipping new well less any value of salvage provided that this cost does not exceed the

7

reasonable market value of well immediately before tubing collapse); Basin Oil of Cal. v. Baash-Ross Tool Co., 125 Cal.App.2d 578, 271 P.2d 122, 138-39 (1954)(where plaintiff's well destroyed due to negligence of defendant, plaintiff was entitled to recover value of well prior to cessation of production plus any reasonable expenses incurred in effort to restore the well to production up to the time of its determination that further efforts at restoration were impractical less the value of salvage realized; damages for new well not allowed where court failed to consider reasonable value of well before and after the damage).

V.

As the court considers the arguments of the parties, we note that there is some dispute concerning whether the damages are temporary or permanent. Midwestern contends that Cheyenne has not shown that the damages are permanent. A review of the record reveals that there is some evidence that Cheyenne deemed the well a complete loss. Jerry Sorrels testified in his deposition that "I don't know that you could repair it again." Moreover, he stated that the "casing is pretty much gone." He further testified that he "wouldn't make any other expenditure to try to repair [it]." This testimony coupled with the evidence that efforts were made to repair the well and were unsuccessful is sufficient to support Cheyenne's contention that the damages were permanent.

8

Then, if the well could not be repaired, the measure of damages is the difference between its fair and reasonable market value immediately before and immediately after the alleged damage by Midwestern. Midwestern argues that Cheyenne has not produced sufficient evidence in support of these damages and thus they are entitled to partial summary judgment on any claim by Cheyenne that it is entitled to the costs of a new well. Again, the court is not persuaded by this argument. Cheyenne contends that the reasonable market value of the well cannot be ascertained because the production records of the well are not adequate. Cheyenne points out that there are no production records because the well was just repaired when Midwestern damaged it. It further notes that the production records from "long ago" would make a determination of reasonable market value "too speculative."

After thoroughly reviewing the arguments of the parties in light of the record before the court, the court is not persuaded that Midwestern is entitled to partial summary judgment on the issue of whether Cheyenne is entitled to damages for the cost of a new well. This conclusion certainly does not mean that Midwestern will not prevail upon this issue at trial. Rather, it simply means that at this point, when the evidence is viewed in the light most favorable to Cheyenne, such a determination cannot be made and must await a full examination of the evidence at trial. Midwestern has raised

some good arguments why Cheyenne is not entitled to damages for the cost of a new well.  But, the court is not satisfied that the record before it allows pretrial determination of this issue.  In any event, as the aforementioned discussion on the law of damages in Kansas and the oil and gas decisions in other jurisdictions indicate, Cheyenne will be limited to the actual value of the Wentworth #1 at the time of the damage caused by Midwestern if Cheyenne proves that the damage to the well is permanent and the well had no market value.  Under these circumstances, Cheyenne could obtain the amounts that it expended to fix the damage and perhaps the cost of a new well but only to the extent that this cost does not exceed the value of the well at the time of the damage in light of such factors as original value, cost of replacement, condition, age and obsolescence.  Accordingly, Midwestern's motion for partial summary judgment shall be denied.

**IT IS THEREFORE ORDERED** that Midwestern Well Service, Inc.'s motion for partial summary judgment (Doc. # 94) be hereby denied.

**IT IS SO ORDERED.**

Dated this 12th day of November, 2013, at Topeka, Kansas.

                             s/ Richard D. Rogers
                             Richard D. Rogers
                             United States District Judge